Day & Zimmerman, Incorporated v. Commissioner.
Day & Zimmerman, Inc. v. Commissioner
Docket No. 210.
United States Tax Court
1944 Tax Ct. Memo LEXIS 168; 3 T.C.M. (CCH) 760; T.C.M. (RIA) 44247; July 27, 1944
*168 Calvin H. Rankin, Esq., for the petitioner. Brooks Fullerton, Esq., for the respondent. TURNER Memorandum Findings of Fact and Opinion TURNER, Judge: The respondent has determined deficiencies in income tax against the petitioner for 1940 and 1941 in the respective amounts of $32,611.82 and $20,426.50. The issues presented are the correctness of the respondent's disallowance of (1) a deduction of $372,056.42 taken by petitioner in 1940 as a long-term capital loss sustained on shares of preferred stock owned by it in Victor Lynn Transportation Company, which completed liquidation in that year; (2) a deduction of $55,681.47 taken by petitioner in 1940 as a long-term capital loss sustained on shares of preferred stock owned by it in Red Star Lines, Inc., which likewise completed liquidation in 1940; and (3) a deduction of $63,450.66 taken by petitioner in 1941 as a long-term capital loss sustained on the sale in that year of shares of common stock in Roanoke-Staunton River Power Company. A portion of the facts as to each of the issues was stipulated and are found as stipulated. Issue L. - Loss on Stock in Victor Lynn Transportation Company Findings of Fact The petitioner is *169 a Maryland corporation, organized in January 1930, and has its principal office in Philadelphia, Pennsylvania. It filed its income tax returns for 1940 and 1941 with the Collector in that city. The petitioner is engaged in the business of construction, making investigations and reports and rendering management services. Victor Lynn Transportation Company, sometimes hereafter referred to as Victor, was a Delaware corporation organized in May 1930, with an authorized capital stock of 5,000 shares of no par value common stock and 5,000 shares of no par value $7 cumulative preferred stock entitled, upon liquidation, to $107 per share plus accumulated dividends. At all times here material the preferred stock, by reason of arrearages in payment of accumulated dividends, was entitled to vote share for share with the common stock. Victor was engaged in the transportation of freight primarily by motor vehicles but to some extent by boat. It transacted business in a number of states. It owned some real estate, a considerable number of trucks, and several boats which operated on Chesapeake Bay. In addition, it had certain franchises or permits to operate over fixed routes and certain rights *170 under the Federal Motor Carrier Act. It also owned 50 percent of the capital stock of the Red Star Garage & Terminal Company. The remaining 50 percent of the stock of that corporation was owned by Red Star Lines, Inc., the majority of whose stock was owned by petitioner, as more fully set out in our findings of fact under the next issue. In August 1938, the issued and outstanding shares of stock in Victor were owned as follows: Preferred
Common
Day & Zimmermann, Inc.
4,950
1,568
John W. Burris
50
50
Lura A. Richards
75
Lee Webster Selfe
75
5,000
1,768
During 1939 and 1940, and so far as disclosed, during the last half of 1938, the officers of the petitioner and of Victor were as follows: Day & Zimmerman, Inc.
Victor Lynn Transportation
Company
W. Findlay Downs
President
Director
H. R. Martz
Senior Vice President
President and Director
H. E. Ehlers
Vice President
Director
C. A. McClure
Secretary
Secretary
David Katz
Treasurer
John W. Burris
Director
Byron D. Greene
Director
Lee Webster Selfe[n*]
Director
[n*] Never connected in any way with Day & Zimmerman, Incorporated.
By August 29, 1938, Victor had run into financial difficulties *171 and was unable to continue its business in an orderly manner because of its inability to meet its obligations as they matured. At the regular monthly meeting of its board of directors held on that date, a resolution was adopted reciting that it was the opinion of the board that it was essential that a receiver be appointed to take charge of the corporation's affairs and administer them for the best interests of the creditors and the stockholders. The president was authorized to consent to the appointment of a receiver and to employ counsel in connection with such action. Prior to this time no plan of liquidation had been adopted by the corporation and none of its property had been distributed in liquidation of its stock. Victor was indebted to petitioner in the amount of $23,609.78, and on August 31, 1938, the petitioner instituted receivership proceedings against it in the Circuit Court of Wicomico County, Maryland. Thereupon the court appointed C. A. McClure and Lee Webster Selfe as receivers. McClure had never acted as a receiver before, and entered into an agreement with petitioner whereby all fees received by him as a receiver for Victor were paid over to petitioner as consideration *172 for its assistance to him in the performance of his duties as a receiver of Victor. Said agreement was similar in all respects to other agreements relative to receivers' fees in other receivers' fees in other receiverships entered into in prior years by petitioner and others of its officers. McClure and Selfe qualified as receivers for Victor and took possession of its business and properties. Immediately upon their appointment the receivers ascertained that the only probability of Victor's creditors being paid in full lay in the sale of its properties as a going concern. Accordingly they operated the properties until March 24, 1939, when the operating properties, including the tangible assets and the rights under the Federal Motor Carrier Act, were sold for $135,500 cash. The permits or franchises to operate over fixed routes were not assignable and hence were not salable. Thereafter the activity of the receivers consisted of liquidating the remaining assets, collecting the accounts receivable, adjudicating creditors' claims, preparing reports, and attending to other matters incident to the receivership. The books of account and corporate records of Victor were kept for the receivers *173 by James Matthews, in th office of the petitioner at Philadelphia. The receivers used Victor's books of account to record their transactions until March 24, 1939. Said books of account were never closed, but the transactions of the receivers subsequent to that date were recorded in other books of account maintained for that purpose and the receivers properly accounted to the court for all assets coming into their possession. The first and partial account of the receivers was stated as of August 22, 1939, was filed with the court on September 9, 1939, and was approved on October 13, 1939. The account showed cash on hand of $18,284.63 on September 1, 1938, and subsequent receipts, primarily from operations and the sale of assets, totaling $647,647.70, or total cash for the period of $665,932.33. The account also showed disbursements for the period in the amount of $619,182.53, the principal portion of which had been made in connection with operations, and remaining cash in the amount of $46,749.80. Included in the disbursements was an amount of $51,497.30, representing a 50 percent distribution made on 535 creditors' claims aggregating $102,995.81. Among these claims was that of petitioner *174 for $24,453.05, on which it received in the distribution the amount of $12,226.51. Also among the receivers' disbursements was an amount of $13,436.57, representing the payment, to the extent of 25 percent, of an indebtedness owing to Red Star Garage & Terminal Company. Red Star Garage & Terminal Company also was in receivership. C. A. McClure was one of the receivers and the books were kept by J. A. Matthews, in the office of petitioner at Philadelphia. Pursuant to the advice of their counsel in July 1939, that the recivershig would have to be carried along for some time because of the possibility of the filing of further claims arising during the period in which the receivers operated the properties of Victor, the receivers did not attempt to wind up the receivership in 1939. On December 21, 1939, the petitioner purchased 50 shares of preferred stock in Victor from John W. Burris, at a total price of $125. With this purchase the petitioner became the owner of the entire outstanding preferred stock of 5,000 shares in Victor and at the same time it continued to be the owner of 1,568 shares of the company's outstanding common stock of 1,768 shares. On December 26, 1939, the receivers *175 advised the stockholders of Victor that the common stock of that company was worthless. On some undisclosed date in December 1939, the petitioner was advised by its counsel that under the Revenue Act of 1939 the deductibility of long-term capital losses sustained in years beginning after 1939 was not limited to $2,000 plus capital gains, but that in view of the provisions of section 112 (b) (6) of the Internal Revenue Code, it would be advisable for petitioner to reduce its holdings in Victor, by a bona fide sale and closed transaction, to an amount which would be less than the 80 percent specified in said section. Counsel also advised petitioner that Congress might pass an act in 1940 which would change the rule. On some undisclosed date in December 1939, but prior to December 27, the petitioner directed the largest and most important firm of auctioneers in Philadelphia which publicly auctioned securities to sell at public auction, to the highest bidder, 1,102 shares of preferred and 191 shares of common stock in Victor. The auction sale of said shares was duly advertised for December 27, 1939. Prior to December 27, 1939, David Katz, treasurer of the petitioner, talked with the *176 bookkeeper for the receivers of Victor. From the information thus obtained, including information as to the amount of cash the receivers had on hand, Katz concluded that in order to make what he considered a reasonable profit, considering the possible future expenses of the receivership and the possibility of additional claims being filed, he could afford to pay $2,200 for the Victor shares to be sold at auction. Katz also discussed with McClure, secretary of the petitioner, and one of the receivers of Victor, the propriety of his bidding at the auction and the probable liquidating value of the shares. McClure advised him that it was the opinion of the officers of the petitioner that it would be proper for any officer or employee of the petitioner to bid at the auction, if he so desired. McClure was also of the opinion, with Katz, that the probable liquidating value of the shares to be auctioned was in excess of $2,200. Katz advised McClure that he intended to bid at the auction but did not discuss with him or anyone else connected with the petitioner the price he expected to bid, nor did anyone connected with petitioner suggest or direct the amount he should bid. Prior to December *177 27, 1939, Katz arranged to obtain from The Pennsylvania Company for Insurance on Lives and Granting Annuities a loan in the amount of $8,200, in event he should acquire the shares of Victor stock that were to be auctioned on December 27, 1939, and 242 shares of preferred and 140 shares of common stock in Red Star Lines, Inc. The latter company likewise was in receivership and the said shares of its stock had been advertised for sale at auction on December 27, 1939, by the firm of auctioneers who had advertised the sale of Victor shares on that date. In order to secure approval of his application for the loan, Katz submitted data to indicate that the liquidating distributions to be received on the shares of stock in the two corporations would amount to more than $8,200. As security for the loan, Katz was to deposit the above-mentioned shares of stock in the two corporations and, in addition, bonds of Associated Gas & Electric Company of a market value of $795 and bonds of the Baltimore & Ohio Railroad Company of a market value of $950. On December 27, 1939, Katz, as the highest bidder at the auction, purchased for $2,200 the 1,102 shares of preferred stock and the 191 shares of common *178 stock in Victor. After deducting the expenses of the sale the auctioneers remitted to petitioner $1,721.33. So far as disclosed Katz's bid was the only one made other than some nominal bids of less than $100. Likewise so far as indicated this was the first time that Katz had ever bid for corporate stock at an auction sale. However, Katz purchased the stock for his own account and there was no understanding between him and the petitioner by which the petitioner retained any interest in the stock or was entitled to share in the proceeds therefrom or agreed to indemnify Katz against loss thereon. Katz continued to be record owner of the stock until the complete liquidation and dissolution of Victor. On December 28, 1939, Katz executed and delivered his promissory note, together with the said shares of stock in Victor and the abovementioned corporate bonds, and obtained the loan of $8,200 as previously arranged. After the sale to Katz of the above-mentioned shares in Victor, the petitioner owned 3,898 shares of preferred, which had a basis of $384,929 for determining gain or loss on the disposition thereof, and 1,377 shares of common, which had a basis of $137,700. The receivers of *179 Victor having theretofore advised that the common stock was worthless, the petitioner on December 31, 1939, charged to its investment reserve the amount of $137,700 representing the basis of the common stock ownod by it. The balance sheet of Victor at December 31, 1939, as shown by its 1939 income tax return filed by the receivers, disclosed the following: ASSETS
* Cash
$40,723.87
Notes and Accounts Receivable
5,248.13
Investment in Red Star Garage & Terminal Company
44,000.00
Funds in restricted banks
4,723.53
$94,695.53
LIABILITIES
Accounts Payable
$52,937.82
Bonds, Notes and Mortgages Payable
6,121.90
$59,059.72
The balance sheet of Red Star Garage & Terminal Company at December 31, 1939, as shown by its 1939 income tax return filed by the receivers, disclosed the following: ASSETS
Cash
$27,661.30
* Notes and Accounts Receivable
16,716.63
Investment in stock in County Trust Co.
28.25
Beneficial certificates of County Trust Co.
14.12
$44,420.30
LIABILITIES
Accounts Payable
$ 418.73
*180 The second and partial account of the receivers of Victor was filed with the court on April 18, 1940, and was approved on May 24, 1940. This account showed that since the stating of the first account the receivers had received or were about to receive $20,976.35, composed as follows: From operations conducted prior to the
appointment of the receivers and
from the operations conducted by
them
$ 2,723.00
Adjustment or repayment of insurance
premiums previously paid
3,729.79
Proceeds of sale of securities
790.67
Amount to be received in liquidation of
Red Star Garage & Terminal Com-
pany on Victor's 50 percent stock-
holding in that company
13,732.89
$20,976.35
The account also showed that the liquidation of Red Star Garage & Terminal Company would reduce by $8,358.31 the balance due by the receivers of Victor to the said company, the $8,358.31 representing the proportion of the debt distributed in liquidation to Victor's receivers; and that the remaining portion of the debt, in the amount of $8,358.32, would be payable to the receivers of Red Star Lines, Inc., on account of that company's ownership of the other *181 50 percent of the stock of Red Star Garage & Terminal Company. The account further showed that since the first audit the receivers had paid additional amounts totaling $9,846.89 on account of taxes, claims and other items arising out of their operation of Victor; that of nine claims totaling $1,473.21, which had been filed at the time of the first audit, two claims totaling $386.21 were admitted to be due; that since the first account eight additional claims totaling $217.14 had been presented and were admitted to be due; and that two claims totaling $70.44 had been presented but had been withdrawn. The account also showed that the Superintendent of Insurance of the State of New York, as liquidator of the Auto Mutual Indemnity Company, had notified the receivers that he was claiming approximately $1,300 to be due him on account of certain policies of insurance issued in 1936 and 1937 by Auto Mutual Indemnity Company. The receivers denied liability on this claim. Because of that claim and of their opinion that other claims of small amounts might be presented from time to time, the receivers expressed the view that it was not desirable that final distribution be made at that time and *182 recommended that approximately $5,000 should be retained in their hands. The receivers estimated that after payment of all claims and expenses approximately $11,800 would remain for distribution to stockholders. The court ordered that $5,000 be retained by the receivers as recommended and directed that the first distribution to stockholders be made. On June 3, 1940, the receivers made their first distribution to the stockholders of Victor, distributing as the first liquidating dividend, the amount of $9,199.94 in cash. The petitioner, as owner of 3,898 out of 5,000 shares of the outstanding preferred stock of Victor, or 77.96 percent of such stock, received $7,172.27. The balance of $2,027.67 was distributed to Katz in respect of th remaining 1,102 shares of preferred stock in Victor. The final account of the receivers was filed with the court on October 25, 1940, and approved on December 3, 1940. All of the proved claims of secured and unsecured creditors which had been presented to the receivers (including the unsecured claim of petitioner for $24,453.05) having been paid in full, a final order was entered by the court on December 3, 1940. This order authorized the receivers to *183 distribute to the preferred stockholders of Victor the amount of $7,306.71 in cash, representing all of the assets remaining in their hands as receivers, in complete liquidation of Victor and in complete cancellation and redemption of all of the stock of that company. On December 6, 1940, the petitioner, as owner of 3,898 shares of preferred stock, received $5,696.31, representing its proportionate share of the final liquidating dividend, and Katz received $1,610.40 with respect to the remaining 1,102 shares of outstanding preferred stock. Thereafter in December 1940 the receivers and their bondsmen were discharged by the court and Victor was dissolved. During 1940 the receivers made 17 collections on accounts payable, such collections ranging in amounts from 42 cents to $846.33 and totaling $2,013.73. Securities were sold on March 29, 1940, for $790.67. Return insurance premiums in the amount of $2,807.31 were received on January 2, 1940, and a dividend from the insurance company of $1,644.68 was received on June 14, 1940. On August 19, 1940, a claim for about $1,300 or $1,400 against a transfer company was settled by acceptance of a payment in the amount of $108.96. On March 31, *184 1940, $13,727.89 was received in liquidation of Red Star Terminal & Garage Company, in which Victor owned 50 percent of the stock. Total receipts of the receivers for 1940 amounted to $21,134.56. In addition to paying the balance owing to the 535 creditors whose claims were included in the first account and making the above-mentioned distributions in liquidation to the preferred stockholders of Victor, the receivers, during 1940, paid 75 separate amounts covering expenses of and claims against the receivership, ranging in amounts from 50 cents to $500 and totaling $1,535.38. The $500 payment was made on October 18, 1940, and represented the amount paid in settlement of the claim for approximately $1,300 made by the Superintendent of Insurance of the State of New York as liquidator of the Auto Mutual Indemnity Company. On its income tax return for 1940, the petitioner deducted $372,056.42 as a long-term capital loss on the 3,898 shares of Victor preferred stock still owned by it in 1940, the amount of the claimed deduction being the difference between $384,925, the cost of the said shares, and $12,868.58, the amount received on the said stock in liquidation of Victor. In determining *185 the deficiency for 1940, the respondent disallowed the deduction so claimed. The liquidation of the Victor Lynn Transportation Company was completed in 1940, and petitioner sustained its loss on the above 3,898 shares of Victor preferred stock in that year. Opinion That petitioner sustained a loss on its investment in the preferred stock of Victor Lynn Transportation Company is not disputed. Neither do we note any dispute over the amount of that loss. The questsion are as to the year in which the loss occurred and whether or not that loss is deductible. Under the statute, section 23 (f) of the Internal Revenue Code, losses are allowable as deductions for the taxable year in which they are sustained, and it is well settled that they are sustained when evidenced by closed and completed transactions. Where, as here, the transaction giving rise to the loss is the liquidation of a corporation, the transaction is completed and the loss is sustained when provision has been made for the corporate debts and the remaining assets, if any, are distributed to the stockholders. Northwest Bancorporation v. Commissioner, 88 Fed. (2d) 293; Dresser v. United States, 55 Fed. (2d) 499, *186 certiorari denied, 287 U.S. 635; $2 Whitney Realty Co., Ltd. v. Commissioner, 80 Fed. (2d) 429, certiorari denied, 298 U.S. 668; Harry C. Howard, 20 B.T.A. 207, affd., 56 Fed. (2d) 781, certiorari denied, 287 U.S. 619. That the distributions to preferred stockholders in liquidation of Voctor were actually made in 1940 is an established fact. It is the claim of the respondent, however, that for all practical purposes liquidation was completed in 1939; that only the formality of making distribution remained to be done thereafter; that the delay in making distribution until 1940 was motivated solely by tax advantages to be gained thereby; that the delay served no business purposes and did not have the effect of placing occurrence of the loss in the year 1940. In support of this claim, he points to the fact that the affairs of the receivership were handled from petitioner's office; that one of the receivers was an employee of petitioner and that this employee paid over his receivership fees to petitioner; that the assets *187 of Victor, Red Star Lines, Inc., and Red Star Garage & Terminal Company had been wholly, or substantially, reduced to cash by the end of 1939; that prior to the end of 1939 the petitioner was aware that, due to a change in the statute, it could deduct long-term capital losses in 1940, but that such deductions were limited in 1939. From these facts, he argues that petitioner through its domination of the receivership was able to postpone, and did actually postpone, final distribution to stockholders from 1939 to 1940, and that the realities of the situation require the finding that the liquidation of Victor occurred in 1939 and that no loss by reason of such liquidation was sustained in 1940. In support of this argument, he cites and relies on Commissioner v. Winthrop, 98 Fed. (2d) 74, affirming 36 B.T.A. 314. In Commissioner v. Winthrop, supra, all the corporate property had been distributed, except some cash, which was retained for the purpose of paying taxes and costs of dissolution, and the stockholders had surrendered their stock. At the same time liquidation certificates were distributed *188 to cover any excess of such cash over the said taxes and costs, and it was rather definitely known that the ultimate distributions under the liquidation certificates would be approximately 20 cents per share. It was held that the loss of a shareholder on his shares of stock, as the result of such liquidation, occurred in the year in which the property and liquidating certificates were distributed, and not some two years later, when distributions amounting to 20 cents per share were made to liquidating certificate-holders. Whether Commissioner v. Winthrop, on its particular facts, is to be regarded as an exception to the general rule that gain or loss to shareholders in liquidation is sustained in the year when such liquidation is completed, or is to be regarded merely as another illustration where, for all practical purposes, liquidation has been completed, we need not here determine, since on the facts the instant case is more nearly comparable to those dealt with in Northwest Bancorporation v. Commissioner, Dresser v. United States, and Whitney Realty Co., Ltd. v. Commissioner, cited above. It is true that the petitioner was aware of the tax advantage if the liquidating *189 transaction was completed in the year 1940, and it is also apparent, we think, that petitioner did have substantial influence with the receivers. Even so, however, the final word on receivership matters was with the court. Furthermore, we think the facts show that the normal and orderly procedures in the receivership of Victor were not completed until the year 1940 and that in the light of things to be done and the duties to be performed there is not sufficient indication of undue delay to justify the conclusion contended for by the respondent. The steps in the liquidation of Victor Lynn Transportation Company were completed in 1940, and final distribution to the stockholders occurred in that year. Those events fixed the date of petitioner's loss on its investment in preferred stock of Victor Lynn Transportation Company. In the alternative, it is the contention of the respondent that the loss on the Victor preferred stock was not a recognizable loss under section 112(b)(6) of the Internal Revenue Code, [1] and for that reason was not deductible in 1940, even though sustained in that year. It is the claim of the petitioner that by reason of its sale of Victor preferred stock at the *190 end of December 1939, it did not at all times after liquidation began own at least 80 percent of the voting stock of Victor, and for that reason section 112(c)(6) does not apply. The respondent's answering argument is that the sale by petitioner of Victor preferred stock to Katz in December 1939 served no business purpose, in that its only purpose was to avoid the provisions of section 112(b)(6), and that under Helvering v. Gregory, 293 U.S. 465 465, the sale of stock to Katz may not be recognized for the purpose of defeating the applicability of section 112(b)(6). We do not find it necessary, however, to consider the arrgument so made by the parties. The distributions in complete liquidation of Victor were made wholly in cash, and we have held in Stimson Mill Co., 46 B.T.A. 141, that section 112(b)(6) was intended to cover situations in which a corporation receives property, not money, in complete liquidation of another corporation, and that the loss is recognizable where sustained by a corporation which owned all of the stock of another corporation and on liquidation of the latter received for such stock money only. *191 That case is controlling here, and the alternative contention of the respondent is accordingly rejected.
*192 Issue II. - Loss on Stock in Red Star Lines, Inc. Findings of Fact Red Star Motor Coaches, Inc., was organized under the laws of Maryland on October 28, 1925, with an authorized capital stock consisting of 10,000 shares of no par value $7 per annum cumulative preferred stock and 10,000 shares of no par value common. On January 22, 1930, the name was changed to Red Star Lines, Inc., and the preferred shares were changed from no par to $100 par value. On liquidation, the preferred was entitled to $100 per share plus accumulated dividends. At all times herein material the preferred stock, by reason of arrearages in payment of accumulated dividends, was entitled to vote share for share with the common. Red Star Lines, Inc., sometimes referred to hereafter as Red Star, was a carrier of passengers and, to a certain extent, of express and newspapers. In addition to its tangible operating properties, it had certain permits or franchises to operate over fixed routes and owned 50 percent of the capital stock of the Red Star Garage & Terminal Company. At all times material herein, the issued and outstanding stock of Red Star consisted of 1,100 shares of preferred and 2,000 shares of *193 common, and in August 1938 was owned as follows: Pfd.
Com.
Day & Zimmermann, Incorporated
1,000
1,700
Lee Webster Selfe
100
200
Lura A. Richards
100
1,100
2,000
During 1939 and 1940, and so far as disclosed, during the last half of 1938, the officers of the petitioner and of Red Star were as follows: Day & Zimmermann,
Red Star Lines,
Incorporated
Inc.
W. Findlay Downs
President
Director
H. R. Martz
Senior Vice President
President and Director
H. E. Ehlers
Vice President
Director
C. A. McClure
Secretary
Secretary and Treasurer
David Katz
Treasurer
* Lee Webster Selfe
Vice President, Superin-
tendent and Director
On August 29, 1938, Red Star was in financial difficulties and was unable to continue business in an orderly manner due to its inability to meet its obligations as they matured. At the regular monthly meeting of its board of directors held on that date, they adopted a resolution reciting their opinion that it was essential that a receiver be appointed to take charge of the corporation's affairs and administer them for the best interests of the creditors *194 and stockholders. The president was authorized to consent to the appointment of a receiver and to employ counsel in connection with such action. Prior to this time the corporation had not adopted any plan of liquidation and had not distributed any of its property in liquidation of any of its stock. Red Star was indebted to petitioner in the amount of $4,500, and on August 31, 1938, the petitioner petitioned the Circuit Court of Wicomico County, Maryland, for the appointment of receivers for Red Star. Thereupon the court appointed C. A. McClure and Lee Webster Selfe as receivers. McClure entered into an agreement with petitioner under which all fees received by him as a receiver were paid over to petitioner as consideration for its assistance to him in the performance of his duties as a receiver of Red Star. The agreement was similar in all respects to other agreements respecting receiver's fees in other receiverships entered into in prior years by petitioner and other of its officers. McClure and Selfe qualified as receivers for Red Star and took over possession of its business and properties. They immediately ascertained that the only probability of Red Star being able to pay its *195 creditors in full lay in the sale of its properties as a going concern. Accordingly they operated the properties until December 31, 1938, when the operating properties, including the tangible assets, were sold for $26,000 cash. The permits and franchises were not assignable, and accordingly were not salable. Thereafter the activity of the receivers consisted of liquidating the remaining assets, collecting the accounts receivable, adjudicating creditors' claims, preparing reports and performing other matters incident to the receivership. The books of account and corporate records of Red Star were kept for the receivers by James Matthews, in the office of the petitioner at Philadelphia. The receivers used the books of account of Red Star to record their transportation until March 24, 1939. The books were never closed, but the transactions of the receivers subsequent to that date were recorded in other books of account maintained for that purpose, and the receivers properly accounted to the court for all the assets coming into their possession. The first and partial account of the receivers was stated as of March 17, 1939, was filed with the court on March 31, 1939, and was approved *196 on May 2, 1939. The account showed cash on hand on August 31, 1938, of $9,078.41 and subsequent receipts, principally from operations, collection of accounts receivable and sale of assets, totaling $76,404.97, or total cash for the period of $85,483.38. The account further showed a cash balance on hand of $5,277.95 after making disbursements for expenses of receivership, including operating expenses of $34,229.31, and payments of claims. On advice of their counsel, the receivers did not attempt to wind up the receivership in 1939, because of the possibility of the filing of further claims growing out of the receivers' operation of Red Star. On December 26, 1939, the receivers advised the stockholders of Red Star that the common stock in the company was worthless. On some undisclosed date in the latter part of December 1939, the petitioner was advised by its counsel that under the Revenue Act of 1939 the deductibility of long-term capital losses sustained in years beginning after 1939 was not limited to $2,000 plus capital gains, but that in view of the provisions of section 112 (b) (6) of the Internal Revenue Code, it would be advisable for petitioner to reduce its holdings in Red *197 Star, by a bona fide sale and closed transaction, to an amount which would be less than the 80 percent specified in said section. Counsel also advised that Congress might change the rule by passing another act in 1940. On some undisclosed date in December 1939, but prior to December 27, the petitioner directed the same firm of auctioneers which auctioned the Victor stock for petitioner to sell 242 shares of preferred stock and 140 shares of common stock in Red Star. The Red Star stock was duly advertised for auction sale on December 27, 1939. Under the same circumstances described in the case of the Victor stock, David Katz, treasurer of the petitioner, decided that he could afford to pay $6,000 for the lot of Red Star stock, made arrangements for a loan to finance its purchase at that price, and on December 27, 1939, purchased it at auction at that price. Katz continued to be the owner of the stock until the complete liquidation and dissolution of Red Star. After the sale to Katz of the above-mentioned shares of stock in Red Star, the petitioner owned 758 shares of preferred stock, which had a basis of $75,800 for determining gain or loss on the disposition thereof, and 1,560 shares *198 of common, which had a basis of $4,588.26. The receivers having theretofore advised that the common stock was worthless, the petitioner on December 31, 1939, charged to its investment reserve the amount of $4,588.26 representing the basis of the common stock owned by it. The balance sheets of Red Star at January 1 and December 31, 1939, as shown by its 1939 income tax return filed by the receivers, disclosed the following: ASSETS
Jan. 1, 1939
Dec. 31, 1939
Cash
$13,671.13
$ 6,968.45
Notes and Accounts
Receivable
31,859.02
621.95
Supplies
101.88
Investments: Red Star Garage &
Terminal Co.
44,000.00
44,000.00
Stock subscription
- County Trust
Co.
1,187.80
1,187.80
Prepaid taxes
1,561.60
$92,381.43
$52,778.20
LIABILITIES
Accounts Payable
$26,691.46
Bonds, Notes and
Mortgages Payable
4,500.00
Accrued expenses: Taxes
1,529.86
Insurance and Pay
Roll
170.56
$32,891.88
None
The second and partial account of the receivers was stated as of April 3, 1940, was filed with the court on April 30, 1940, and was approved on May 27, 1940. This account showed that since the stating of the first account the receivers had received, or were about to receive, *199 $24,765.82, consisting of the following: From operations conducted prior to
the appointment of the receivers
and from operations conducted by
them
$ 1,587.44
Adjustment or repayment of insur-
ance premiums previously paid
473.54
Amount received from the sale of se-
curities
238.62
Amount received in compromise set-
tlement of suit for $2,000 against
Dolly Purnell
375.00
Amount to be received in liquidation
of Red Star Garage & Terminal
Company on Red Star's 50 percent
stockholding in that company
13,732.90
Amount to be received from Victor
Lynn Transportation Company rep-
resenting 50 percent of the debt due
to Red Star Garage & Terminal
Company
8,358.32
$24,765.82
The account further showed that since the filing of the first account three additional claims totaling $58.75 had been presented; that since the first distribution to creditors, $472.55 had been paid on account of taxes and other items arising out of the operation of the business by the receivers; and that the receivers had on hand, or expected to receive, $29,571.22 for expenses, claimants and stockholders. The receivers expressed the belief that other claims of small amounts might be presented from time *200 to time and that therefore it was not desirable to make a final distribution at that time. They recommended that approximately $500 be retained in their hands with which to pay any balance of receivers' operating expenses which might remain unpaid and claims filed theretofore which might thereafter be found proper for payment. The court ordered that $500 be retained by the receivers as recommended, and directed that the first distribution to the stockholders be made. On June 3, 1940, the receivers made their first distribution to the stockholders of Red Star, distributing as the first liquidating dividend the amount of $28,964.74 in cash. The petitioner, as owner of 758 shares out of 1,100 shares of outstanding preferred stock of Red Star, or 68.91 percent of such stock, received $19,959.60. The balance of $9,005.14 was distributed to the owners, including Katz, of the remaining 342 shares of preferred stock. The final account of the receivers was filed with the court in August 1940, and was approved by the court during that month. That account corrected an understatement of receipts as shown in the previous account. It showed no receipts since the previous account, but showed expenditures *201 totaling $299.74 for expenses of the receivership and a balance of $205.26 remaining for distribution to the preferred stockholders. By reason of a net decrease of $25.38 in the liabilities to be paid, the amount actually available for distribution to the preferred stockholders was $230.64. In their final account, the receivers requested an order of the court dissolving Red Star and directing the distribution to the preferred stockholders of the money remaining in their hands. Thereafter, all of the proved claims of secured and unsecured creditors presented to the receivers (including the unsecured claim of petitioner for $4,506) having been paid in full, a final order was entered by the court on October 21, 1940, dissolving Red Star and directing the receivers to distribute to the preferred stockholders the amount of $230.64 in cash, which was all the assets remaining in their hands as receivers, said distribution to be in complete liquidation of Red Star and in complete cancellation and redemption of all of the stock of that company. On November 6, 1940, the petitioner, as owner of 758 shares of Red Star preferred stock, received $158.93 in cash, representing its proportionate share *202 of the final liquidating dividend. The balance of $71.71 in cash was paid to the owners, including Katz, of 342 shares of preferred stock. Subsequently in 1940 the receivers and their bondsmen were discharged by the court and the receivership proceeding closed. During 1940 the cash receipts of the receivers totaled $22,739.59 and consisted of the following amounts: January 16
$ 25.78
March 19
Sale of stock in County
Trust Co. of Maryland
213.62
March 26
First National Bank of
Chestertown
8.97
April 22
Settlement of damage
for $2,000 against Dolly
Purnell
375.00
April 26
Liquidation of Red Star
Garage & Terminal Co.
- 50 percent stock own-
ership
13,727.90
May 18
Sale of stock in Synepre-
sent Pier & Improve-
ment Co.
30.00
[n*]
Liquidation of Red Star
Garage & Terminal Co.
- 50 percent stock own-
ership
8,358.32
$22,739.59
[n*] This item represented cash paid to Red Star by Victor Lynn Transportation Company as Red Star's share of an indebtedness of $16,716.63 owing by Victor to Red Star Garage & Terminal Company.
During 1940 the receivers made 24 disbursements totaling $29,708.04, of which six disbursements. totaling $29,195.38, represented *203 distributions in liquidation made to preferred stockholders. On its income tax return for 1940, the petitioner deducted $55,681.47 as a long-term capital loss on the 758 shares of Red Star preferred stock still owned by it in 1940, the amount of the claimed deduction being the difference between $75,800, the cost of the said shares, and $20,118.53, the amount received on the said stock in liquidation of Red Star. In determining the deficiency for 1940, the respondent disallowed the deduction so claimed. The liquidation of Red Star Lines, Inc., was completed in 1940, and the petitioner's loss on the above 758 shares of preferred stock of that company was sustained in that year. Opinion The contentions of the parties with respect to the time when petitioner's loss on the Red Star preferred stock was sustained and as to the deductibility of the loss for 1940 are the same as in the case of petitioner's loss on the preferred stock of the Victor Lynn Transportation Company. While the evidence does indicate that the liquidation of Red Star was nearer completion in 1939 than the liquidation of Victor, we are of the opinion and have found that the liquidation was in fact completed in 1940. *204 For reasons already expressed on the Victor stock loss issue, we conclude and hold that petitioner sustained its loss on the Red Star preferred stock in 1940 and in computing its net income for that year is entitled to a long-term capital loss deduction therefor. Issue III. - Loss on Stock in Roanoke-Staunton River Power Company Findings of Fact The Roanoke-Staunton River Power Company, sometimes hereafter referred to as Roanoke, was organized in July 1924, under the laws of Virginia, as a public utility authorized to conduct the business of an electric light, heat, power and water company. In addition, it was authorized to purchase or lease lands and water rights in or adjacent to the Roanoke and Staunton Rivers and use and develop them for the purposes of its business. On organization the authorized capital stock of Roanoke consisted solely of 50,000 shares of common stock of a par value of $10 each. At no time has the issued and outstanding stock exceeded 19,740 shares. Since January 1, 1933, W. Findlay Downs has been president of Roanoke as well as president of petitioner. During this time C. A. McClure has been treasurer of Roanoke as well as secretary of petitioner. *205 Prior to 1937 the petitioner was the owner of the entire capital stock of Day & Zimmerman Securities Corporation, the officers of the two corporations being the same persons. On July 20, 1937, Day & Zimmerman Securities Corporation was dissolved, and on September 1, 1937, the petitioner received all of its assets as a distribution in liquidation. Among the assets thus received by petitioner were 6,333 shares of stock in Roanoke which had been acquired by Day & Zimmerman Securities Corporation during the years 1926 through 1931 for cash in the total amount of $63,330. It is stipulated that the basis of the said shares to petitioner for determining gain or loss thereon was $63,330. Immediately preceding the distribution to petitioner, the outstanding stock in Roanoke was held of record as follows: Shares
Day & Zimmerman Securities Cor-
poration
6,333
E. H. Rollins & Sons, Brokers, New
York, N. Y.
6,333
Cassatt & Company, Philadelphia,
Pa.
6,333
Other (minor) stockholders
741
19,740
In 1924 a predecessor of petitioner began an investigation or survey for Roanoke, which extended over three or four years, of the power possibilities of a dam site known as Smith Mountain *206 dam site. This site is located on the headwaters of the Roanoke River, below Roanoke, Virginia, in Pittsylvania County, Virginia, at the point where the river flows through the gap in Smith Mountain. On an air line the site is 32 miles from Danville, 32 miles from Lynchburg and 28 miles from Roanoke. One railroad runs about 12 miles east of the site and another is about 12 miles sough of it. Toshes, Virginia, about 12 miles away, is the nearest village or settlement. During the course of the investigation, Roanoke, in 1925, purchased for $98,715.14 the following tracts of land, which it still owns: Acres
Smith Mountain Tract, Bedford
County, Virginia
1,608.37
Undivided one-half interest in Gil-
mer-Dabney-Smith Mountain
Tract, Pittsylvania County,
Virginia
4,300
Miscellaneous Tracts, Franklin,
Bedford and Pittsylvania Coun-
ties, Virginia
111.15
The Smith Mountain tract extends along the left bank of Roanoke River for approximately 6,000 feet, including the entire length of the gap made by the river in Smith Mountain. This tract has a considerable amount of merchantable timber on it. The Gilmer-Dabney-Smith Mountain tract extends along the right bank of the river for *207 about one-half mile, including the length of the gap and an additional length above the gap. This tract extends back from the river for about seven miles. Adjoining this tract and extending down the river from it is an 80-acre tract which extends along the river for several hundred feet, and in which Roanoke owns a one-half interest. Of the other lands of Roanoke, some were above and some were below the gap at Smith Mountain. During the period 1924 through 1931, Roanoke expended $2,782.02 for options and renewals thereof on the land of others. Roanoke's balance sheet at December 31, 1933, showed an item of options in the amount of $23,097.56. This item included the said $2,782.02 and certain other amounts paid as salaries, attorneys' fees, etc. After 1933 Roanoke never renewed any options and all options it had theretofore acquired were permitted to expire. By the end of 1933, Roanoke had expended $66,261.89 on investigations, engineering surveys, explorations, reports, legal expenses, etc. Of this amount, $60,261.81 was for engineering services rendered by a predecessor of petitioner during the period from September 1, 1925, to April 30, 1929. During the period from 1934 through *208 1936 Roanoke expended $2,148.45 for engineering services, reports, legal expenses, etc. During the period from the time of its organization through 1933, Roanoke received $8,988.69 from sales of timber. The only income it had during this period was the undisclosed portion of that amount which represented income. No construction work has ever been done by Roanoke, and except for explorations and surveys, no other work has ever been done by it with respect to any of its property. In July 1933, the South Atlantic Division Engineer made a report to the Office of Chief of Engineers, United States Army, of a study which his office had made of the Roanoke River. The report showed that while the Roanoke River basin was a source of potential hydroelectric power which could be developed if a market were available, a comprehensive plan for the improvement of the river and its tributaries for navigation and the prosecution of such improvement in connection with the development of potential power, flood control or irrigation were not economically justifiable at that time. As a part of the study covered by the report, investigation was made of 58 sites on the Roanoke, Roanoke-Staunton and Dan *209 Rivers and their important tributaries. It was found that at 22 of these sites, which included the Smith Mountain site, there was a reasonable likelihood that hydroelectric projects might be installed on a paying basis, provided that a market for the power be developed. On the basis of an estimated capital cost of the development of the Smith Mountain site at $3,018,000, and other estimates as to power that might be produced, the proceeds thereof and operating charges, the gross annual value of the power that might be produced was estimated at approximately $200,000 in excess of estimated annual fixed and operating charges. In its Federal capital stock tax returns for the years ended June 30, 1933, and June 30, 1934, Roanoke claimed exemption, on the ground that it was not transacting any business. In an affidavit attached to the return for the year 1934, it was stated that the company, because of financial conditions, had definitely abandoned its plan for constructing a hydroelectric plant at the Smith Mountain site; that it had no assets except its land in that vicinity, which it was endeavoring to sell; and that no use was being made of the land. Exemption from capital stock tax *210 was denied for 1933, but was granted for 1934. During 1933 through 1936, Roanoke spent $3,442.51 in unsuccessful efforts to sell its properties to Duke Power Company, of North Carolina, and the City of Danbury, Virginia. Since 1936, it has had no activities other than that of continuing its efforts to sell its land as a power site, and no expenditures except for the payment of salaries, real estate and other taxes, and administrative legal expenses. About 1936, Willis G. Waldo, consulting engineer of Washington, D.C., was engaged by certain persons interested in obtaining a site for a hydroelectric development for the City of High Point, North Carolina, to locate such a site and work up a project which could be used in obtaining funds for its development from the Public Works Administration. After Waldo had made preliminary studies of the Smith Mountain site and had spent about $16,000 of his own funds down to the latter part of 1937, it was found that the city could not own a plant located outside of North Carolina. Subsequently, and in 1940, certain persons interested in an electrochemical enterprise investigated the site, but decided to locate their plant elsewhere. Later Waldo *211 made an effort to obtain a ferromanganese industry for the site, but his efforts had to be abandoned when it was found that the raw material, manganese, was not available in sufficient quantities to make the operation successful. In 1941 persons interested in the same type of industry became interested in the same type of industry became interested in the site. At a meeting of Roanoke's directors on September 15, 1943, they considered the question of using the timber as a source of income to pay current expenses until some other source of revenue could be obtained. They also considered the prospects of selling the site, but up to the time of the hearing no sale had been made. In the latter part of 1936 or the early part of 1937, Waldo asked for and was granted an option to purchase Roanoke's site and lands for $225,000. From time to time afterwards, as prospective purchasers showed an interest in the property, he obtained renewals of the option, the last being given in August 1941, for a period of six months. Subsequent to 1937 and up to November 1942, WALDO EXPENDED ABOUT $1,000 OF HIS FUNDS INVESTIGATING THE PROPERTY AND ATTEMPTING TO SELL IT, THE LAST OF SUCH EXPENDITURES BEING *212 MADE DURING THE YEAR ENDED November 21, 1942. Waldo had no agreement or understanding with anyone for reimbursement of expenditures made by him in his attempts to sell Roanoke's property; he expected to obtain reimbursement from the party or parties who acquired and developed the property. In 1940, as a result of an unusual flood along the Roanoke River, the United States Engineer's Office of the War Department made further flood control and power studies of the basin of that river, including the Smith Mountain site. While a report of these studies has been made, it had not been made public at the time of the hearing in this proceeding. However, on June 22, 1943, public notice was given that the report was partially favorable to the improvements desired, in that it contained a recommendation for the construction of multiple purpose reservoirs which would afford a substantial degree of flood protection to areas along the Roanoke River below Roanoke, Virginia. The reason given for recommending only the multiple purpose reservoirs was that they were justified by reasonably prospective benefits, whereas the desired improvements not recommended would be too costly to be justified by the *213 then anticipated benefits. The Smith Mountain site was included in the improvement projects recommended. Any plan for the improvement of the Roanoke River as a whole would provide for the construction of a storage dam at its headwaters, and a dam at the Smith Mountain site would entirely control the flood of floodwaters above that point. During the period from 1926 through 1933, Roanoke's three principal stockholders, Day & Zimmerman Securities Corporation, Cassatt & Company and the beneficial owners of the stock registered in the name of E. H. Rollins & Sons. Brokers, made advances to Roanoke and received in return stock in that corporation. Thereafter, through 1941, petitioner and certain other stockholders advanced money to Roanoke and received in return notes of Roanoke, which were payable on demand, and at Roanoke's option, were payable in its stock at $10 per share. During 1941 the petitioner loaned $405.19 to Roanoke. The balance sheets of Roanoke, as of the indicated dates, disclose the following: ASSETS
Dec. 31, 1940
Dec. 31, 1941
Notes and Accounts
Receivable
$ 1,000.00
$ 1,000.00
Land
98,715.14
98,715.14
Options
24,457.56
24,457.56
Cost of acquiring
properties
68,410.34
68,410.34
Organization expense
2,370.00
2,370.00
Deficit
16,849.83
17,457.61
$211,802.87
$212,410.65
LIABILITIES AND CAPITAL
Accounts Payable
$ 1,691.61
$ 586.67
Notes Payable (to
stockholders)
12,711.26
14,423.98
Common Stock (19,740
shares)
197,400.00
197,400.00
$211,802.87
$212,410.65
*214 At no time during December 1941 was the indebtedness of Roanoke in excess of $15,010.65, representing the total of accounts and notes payable at December 31, 1941. The notes payable were, at the option of Roanoke, payable in its capital stock at $10 per share. Of the $12,711.26 of notes payable at December 31, 1940, $6,874.22 represented notes payable by Roanoke to petitioner. Roanoke's lands in the following counties of Virginia were valued by the Virginia officials for the assessment of real estate taxes for 1941 as indicated: Pittsylvania County
$ 1,893.00
Bedford County
30,374.00
Franklin County
150.00
$32,417.00
On or about December 5, 1941, the petitioner directed Adrian H. Muller & Son, of Jersey City, New Jersey, auctioneers of securities, to sell at public auction, to the highest bidder, the 6,333 shares of stock it owned in Roanoke. The auctioneers advertised the sale to be held on December 12, 1941. On December 5, 1941, C. H. McClure, secretary of petitioner, wrote letters to George F. Rowell, Willis G. Waldo, and Harry Williams, Jr., vice president of International Utilities Corporation, which corporation was the beneficial owner of the 6,333 shares of *215 Roanoke stock registered in the name of E. H. Rollins & Sons, Brokers. He advised them that petitioner had that day left with Adrian H. Muller & Son a certificate for the 6,333 shares of stock it owned in Roanoke to be sold at public auction to the highest bidder, and informed them of the time and place of the sale. George F. Rowell is an engineer, who has long been employed by petitioner in that capacity. He had charge of the survey made of the Smith Mountain site in the period from 1924 to 1927 or 1928, has been over the property many times, and is well acquainted with it. The first time Rowell learned about the petitioner selling the Roanoke stock was when McClure told him petitioner was considering selling it for the purpose of taking a tax loss. At the public auction of the 6,333 shares of Roanoke stock owned by petitioner, Rowell was the highest bidder, and purchased the entire block of stock for $10. He purchased the stock for his own account, and at his own risk, paid for it with his own funds, and at all times since has continued to be the record owner of it. Rowell never discussed the price which he expected to bid at the auction with anyone connected with petitioner; nor *216 did anyone connected with the petitioner suggest to him the price he should bid for the stock. Rowell purchased the stock with a full knowledge of Roanoke's property. After purchasing the stock, Rowell and one of the other principal stockholders advanced to Roanoke, as a loan, the amount of $489.98, representing money necessary to pay Roanoke's real estate taxes for 1942 of $464.98 and its franchise tax of $25. Roanoke is not delinquent in any of its tax liabilities. The charges and expenses of the sale of the stock amounted to $130.66, so that after being credited with the proceeds from the sale of $10, the petitioner was required to and did pay to the auctioneers, in 1941, the balance of $120.66. On its income tax return for 1941 the petitioner deducted $63,450.66 as a long-term capital loss on the 6,333 shares of Roanoke stock, the deduction claimed being $63,330, petitioner's basis for the stock, plus $120.66, the amount paid to the auctioneers for making the sale. In determining the deficiency for 1941, the respondent disallowed the deduction claimed. The stock of the Roanoke-Staunton River Power Company was not worthless prior to 1941. Opinion It is the claim of the respondent *217 that the stock of Roanoke-Staunton River Power Company was worthless prior to the beginning of the taxable year 1941 and that petitioner did not therefore sustain a loss upon the sale of its stock in that company on December 12, 1941. Certainly the price of $10 at which the stock did sell is anything but an indication that it had value, particularly when it is noted that the costs of the sale exceeded the selling price by $120.66, and we have no reason to assume from the record here that a similar sale held in 1940 would have resulted differently. Even so, we think the evidence of record refutes the claim of the respondent that the stock was worthless. The facts show that Roanoke was inactive or dormant at all times during 1941, and had been so for a number of years, and that in reality its only activity since its organization had been that of trying to promote its property as a dam site for power and flood control purposes. The property, consisting of 1,719.52 acres of land owned outright and an undivided one-half interest in 4,300 acres, had been acquired in 1925, at a total cost of $98,715.14, and at December 31, 1940, was carried on the company books at cost. In addition to the *218 land, the balance sheet of the company for December 31, 1940, listed assets consisting of notes and accounts receivable, options, cost of acquiring properties and organization expenses in varying amounts. Other than the fact that they were shown on the balance sheet at $1,000, we have no information concerning the notes and accounts receivable, and there is nothing in the record which would in our opinion justify the attributing of any value, for the purposes here, to the options, cost of acquiring properties and organization expense. Against the above assets, the balance sheet for December 31, 1940, shows liabilities, exclusive of capital stock, consisting of accounts payable in the amount of $1,691.61 and notes payable in the amount of $12,711.26. It is noted, however, that the notes payable were held by the stockholders of Roanoke and at the option of Roanoke were payable in its capital stock, at the rate of $10 per share. The result was that Roanoke's total liabilities ahead of the claims to its stockholders amounted to only $1,691.61. From the above, it is apparent, we think, that the value of the Roanoke stock, if any, must spring from or rest upon the potentialities of the *219 real estate as a power dam site or upon its value generally. The company owned outright 1,719.52 acres of land and an undivided one-half interest in 4,300 additional acres. There was on these lands a substantial amount of merchantable timber. Furthermore, we think the potentialities of the property as a power or flood control dam site are such as to contribute some value to the property. Against this, the liabilities at December 31, 1940, senior to the claims of stockholders, amounted to only $1,691.61. It is our opinion, and we have found as a fact, that the stock of Roanoke-Staunton River Power Company was not worthless at December 31, 1940, as the respondent contends, and that the petitioner is accordingly entitled to deduct its loss on the said stock resulting from its sale in December of 1941. Decision will be entered under Rule 50. Footnotes
*. The amount of $40,723.87 was taken from a bank statement which did not reflect certain checks outstanding and which had not been presented for payment. The correct amount was $40,599.16.↩
*. This item represented indebtedness owing by Victor.↩
1. SEC. 112. RECOGNITION OF GAIN OR LOSS. * * * * *
(b) Exchanges Solely in Kind - * * * * *
(6) Property Received by Corporation on Complete Liquidation of Another. - No gain or loss shall be recognized upon the receipt by a corporation of property distributed in complete liquidation of another corporation. For the purposes of this paragraph a distribution shall be considered to be in complete liquidation only if - (A) the corporation receiving such property was, on the date of the adoption of the plan of liquidation, and has continued to be at all times until the receipt of the property, the owner of stock (in such other corporation) possessing at least 80 percentum of the total combined voting power of all classes of stock entitled to vote and the owner of at least 80 per centum of the total number of shares of all other classes of stock (except nonvoting stock which is limited and preferred as to dividends), and was at no time on or after the date of the adoption of the plan of liquidation and until the receipt of the property the owner of a greater percentage of any class of stock than the percentage of such class owned at the time of the receipt of the property; * * *↩
*. Never connected in any way with Day & Zimmermann, Incorporated.↩